# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                    No. CR 04-1684 LH

JERRY A. TAFOYA,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Jerry A. Tafoya's Motion to Suppress Statements and Derivative Evidence, filed February 16, 2005.  The Court held a four-hour evidentiary hearing on May 24, 2005.  The primary issues are whether the interrogating detectives violated Tafoya's <u>Miranda</u> rights and the voluntariness of Tafoya's statements.  Consistent with the Court's ruling at the hearing on this motion, and for the reasons given at the time of the hearing, Tafoya's motion is denied.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the voluntariness of an individual's confession or consent to search.  <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269 (10th Cir. 1982).  In deciding such preliminary questions, the

other rules of evidence except those with respect to privileges do not bind the Court.  See Fed. R.

Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See

United States v. Merritt, 695 F.2d at 1269.

## FACTUAL BACKGROUND

**1.     Pre-interrogation Events.**

1.     Before the events of August 5, 2004, Tafoya and his wife, Lynette Tafoya, had

a disagreement over the wife's several months running affair.  See Transcript of Hearing at 49:21 -

50:2 (taken May 24, 2005)(hereinafter "Transcript").[1]

2.     Tafoya's wife was involved with another man, and Tafoya knew about the

affair.  Tafoya and his wife proceeded to have a discussion on what they should do about their

marriage and their relationship. The discussion between Tafoya and his wife upset both of them. See

Transcript at 49:21 - 50:2.

3.     Before August 5, 2004, Tafoya had obtained a semi-automatic handgun and

kept it in the dresser drawer in the couple's bedroom.  See Transcript at 51:16-20.

**2.     Pre-interrogation Events of August 5, 2004.**

4.     Because of the upsetting situation in the household on August 5, 2004, Tafoya

removed the loaded magazine from the firearm.  See Transcript at 50:13-17.  Tafoya thought this

action would prevent the gun from firing.  See Videotape of Defendant's Interrogation at 4:34

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

(hereinafter "Tafoya's Interrogation").[2]

5.      Subsequently, without any assistance from Tafoya, his wife picked up the handgun, put it to her head, and pulled the trigger.  See Tafoya's Interrogation at 4:34.

6.      There was a live cartridge in the chamber.  The gun could fire without the magazine in the firearm.  See Tafoya's Interrogation at 4:34.

7.      Neither Tafoya nor his wife realized the gun was capable of firing with the magazine removed, and his wife accidently killed herself.  See Tafoya's Interrogation at 4:34.

**3.      Initial Investigation.**

8.      On August 5, 2004, at approximately 9:30 a.m., the Bernalillo County Sheriff's Office ("BCSO") responded to a 911 call from Tafoya at 3116 Silvia Rd. S.W. in Albuquerque regarding a female who had used a firearm to kill herself in his presence.  See Transcript at 31:8-23.

9.      Upon their arrival, the Sheriff's deputies encountered Tafoya in the master bedroom, leaning over his wife's body.  See Transcript at 33:12-14.  Rescue personnel arrived and determined that Tafoya's wife was dead.  See id. at 33:24 - 34:6.

10.      Deputies secured the residence and escorted Tafoya to a patrol vehicle pending arrival of BCSO detectives.  See Transcript at 33:12-17.

11.      The detectives learned that Tafoya had called 911 to report that his wife shot herself in his presence.  Tafoya had also called Virginia Sigala, his wife's mother.  See Transcript at 50:22 - 51:3.

12.      Sigala told the deputies her daughter and son-in-law had a "rough marriage."

_____

[2] The Court's citations to the videotapes of the Defendant's interrogation refer to the time indicated on the tapes.

She was convinced that Tafoya killed his wife.  <u>See</u> Transcript at 35:8-13.

13.     Based upon this preliminary information, the lead investigator, Detective Shureke Covington, requested that a Sheriff's deputy transport Tafoya to the Sheriff's Office.  <u>See</u> Transcript at 37:14-17.  Sheriff's deputies took Tafoya into custody.  <u>See</u> <u>id.</u> at 38:7-10.

14.     Over the course of approximately three hours that morning, detectives spoke to other family members and friends, all of whom confirmed that Tafoya and his wife had been experiencing marital problems.  <u>See</u> Transcript at 36:2-4; 37:19-21.

15.     Covington and Detective Robert Bolin prepared an application for a search warrant of Tafoya's home and person, which the Honorable James Blackmer, New Mexico District Judge, Division II, Second Judicial District, County of Bernalillo, approved that afternoon.  <u>See</u> Transcript at 44:25 - 45:2; Search Warrant at 1.

**4.     The Interview Room and Statements Obtained.**

16.     Sheriff's deputies transported Tafoya to the BCSO main office and placed him in an interview room.  <u>See</u> Transcript at 38:7-15.  The interview room had a single door that was locked from the outside, and Tafoya could not leave that room.  <u>See</u> <u>id.</u> at 58:25.

17.     The interrogation room was equipped with a video camera.  <u>See</u> Transcript at 58:25.  The video camera filmed the events that occurred in the room over that day.  Tafoya did not know that he was being recorded.  <u>See</u> Tafoya's Interrogation at 11:00-6:12.

18.     The videotape started at 10:59 a.m.  <u>See</u> Tafoya's Interrogation at 10:59.  Tafoya's interrogation took place between 11:00 a.m. and 6:12 p.m.  <u>See</u> Tafoya's Interrogation at 11:00-6:12.

19.     Sheriff's deputies asked Tafoya if he was all right and he responded: "How can

it be all right?"  Sheriff's deputies asked Tafoya if he needed anything, and they left to get him a soda.
See Tafoya's Interrogation at 11:00.

       20.    At that point, Tafoya began crying.  He laid down in the fetal position and sobbed loudly.  He was both crying and pounding on the floor with his feet.  See Tafoya's Interrogation at 11:01-02.

       21.    Tafoya stopped sobbing to catch his breath and then began sobbing again.  See Tafoya's Interrogation at 11:03.  There was no one present during the day to console him.  See id., 11:00-6:12.

       22.    The Sheriff's deputies returned to the room while Tafoya was on the floor.  They asked Tafoya: "Are you all right?"  He said: "No, not really."  See Tafoya's Interrogation at 11:07.

       23.    The Sheriff's deputies gave Tafoya a soda, and asked him his date of birth, address, and other basic information.  See Tafoya's Interrogation at 11:07.

       24.    Within ten minutes of arriving, Tafoya asked the deputies to use a telephone.  They told Tafoya it would be a little while before he could use a telephone.  Sheriff's deputies told Tafoya to hang out a little and that they would explain everything.  See Tafoya's Interrogation at 11:08.

       25.    At no time did the police allow Tafoya to make the telephone call that he requested within the first ten minutes of being placed in the interrogation room.  See Tafoya's Interrogation at 11:00-6:12.

       26.    After the police leave the room, Tafoya resumed his fetal position on the floor crying loudly, stopping at times to catch his breath.  See Tafoya's Interrogation at 11:09.

27.     Sheriff's deputies returned to the interrogation room and asked Tafoya to stand up.  They told Tafoya they were going to need his clothes for testing.  <u>See</u> Tafoya's Interrogation at 11:14-15.

28.     Sheriff's deputies began the forensic investigation of Tafoya.  They first photographed Tafoya in his clothing and then requested that Tafoya remove his clothing to be tested for any trace evidence.  Tafoya complied with these requests.  <u>See</u> Tafoya's Interrogation at 11:16.

29.     Sheriff's deputies explained the investigation required them to do this photography and testing, and took Tafoya's clothes.  They then photographed Tafoya's nude body and again explained why they were taking such photographs.  <u>See</u> Tafoya's Interrogation at 11:18-20.

30.     Sheriff's deputies gave Tafoya a jumpsuit to wear.  They explained to Tafoya that taking pictures was part of the procedure and that it would be helpful to him also.  <u>See</u> Tafoya's Interrogation at 11:22-23.

31.     Tafoya again asked to use the telephone, and the deputies told him there would be no telephone call for a while.  <u>See</u> Tafoya's Interrogation at 11:25.

32.     The Sheriff's deputies left.  Tafoya was locked in the interrogation room without his clothes or property, in a temporary jumpsuit.  He resumed his fetal position on the floor. <u>See</u> Tafoya's Interrogation at 11:25-26.

33.     The Sheriff's deputies come in again and examine him with a powerful flashlight, especially his hands, looking for gun powder residue.  <u>See</u> Tafoya's Interrogation at 11:38.

34.     The Sheriff's deputies left at 11:40 a.m.  Tafoya went to the door and knocked, but there was no response.  He laid back down and began to cry.  <u>See</u> Tafoya's Interrogation at 11:40-45.

35.     Covington arrived and explained to Tafoya what the Sheriff's deputies were doing.  He explained that the investigation process would take several hours and that Tafoya would need to remain at BCSO while the investigation proceeded.  <u>See</u> Tafoya's Interrogation at 11:46-48.

36.     Tafoya told Covington he wanted to be with his children.  Covington told Tafoya that his children were fine and with his mother.  Tafoya was upset, and was crying on and off during the conversation.  <u>See</u> Tafoya's Interrogation at 11:49-51.

37.     Tafoya asked Covington: "So, I don't have to say anything?"  Covington replied: "You don't have to say anything you don't want to say."  Tafoya asked: "What if I want to?"  Covington responded: "If you want to say something, that's up to you."  Tafoya said: "Not right now."  Tafoya's Interrogation at 11:52.

38.     Covington left to get Tafoya lunch.  Tafoya began crying.  <u>See</u> Tafoya's Interrogation at 11:55-56.

39.     A Sheriff's deputy entered and asked Tafoya if the house on Silvia Road was his.  Tafoya told him that it was.  <u>See</u> Tafoya's Interrogation at 12:01.

40.     The deputy left and Tafoya sat in the chair and fell asleep.  <u>See</u> Tafoya's Interrogation at 12:05.

41.     Covington returned to the room with lunch for Tafoya and then left.  Tafoya ate it off camera, and was crying while trying to eat.  <u>See</u> Tafoya's Interrogation at 12:30.

42.     Tafoya knocked on the door.  After a few seconds, someone answered.  Tafoya asked to use the restroom.  The officer told Tafoya that he would have to ask someone else.  Tafoya returned to the chair with his head down, his feet on the chair, his head on his knees.  The officer returned and told Tafoya that they needed to swab his hands before he went to the restroom.

<u>See</u> Tafoya's Interrogation at 12:36-37.

43.     Covington returned with another deputy to swab Tafoya's hands. Covington took Tafoya to the restroom. The deputies returned Tafoya to the interview room and left him alone. <u>See</u> Tafoya's Interrogation at 12:47-53.

44.     A detective entered to take a mouth swab from Tafoya. Tafoya was then left alone in the interview room for approximately two hours. He was asleep in the chair during this period. <u>See</u> Tafoya's Interrogation at 1:33-3:40.

45.     Covington returned, asked Tafoya his date of birth, and then administered his <u>Miranda</u> warnings. As Covington began reading Tafoya his <u>Miranda</u> warnings, Tafoya asked: "Am I being arrested?" Convington responded: "No, you're not arrested," and then completed administering Tafoya his <u>Miranda</u> warnings. Once he had finished, Covington asked: "Do you understand your rights?" Tafoya responded: "Yes." Covington asked: "Do you have any questions about your rights?" Tafoya replied: "About my rights? No." Covington asked: "Do you understand everything I've read to you, that you don't have to talk to me, that you're doing this under your own free will?" Tafoya replied: "I understand. Are you charging me? Am I arrested?" Convington explained that Tafoya was not under arrest and the investigation was continuing, but that he needed to clear up some things. <u>See</u> Tafoya's Interrogation at 3:40-42.

46.     Covington did not mention that Tafoya has already said he does not want to make a statement. Tafoya did not expressly agree to talk or to waive his rights, and Covington did not present Tafoya with a written waiver form. <u>See</u> Tafoya's Interrogation at 3:40-42.

47.     In the interview, Tafoya first spoke about the marital situation. He stated that, on August 4, 2004, Tafoya's wife told him at their home about an extramarital affair in which she had

been involved and that she had purportedly ended a few weeks earlier.  Tafoya said that he had been

suspicious about the affair before this revelation, but that it did not change the way he loved his wife.

Tafoya said that he and his wife were are home when she left for the rest of the day.  See Tafoya's

Interrogation at 3:45-47.

48.     Tafoya spoke to his wife by telephone later that evening.  Both he and his wife

returned home at about 11:00 p.m. that night and went to bed.  See Tafoya's Interrogation at 3:47.

49.     Tafoya said that, early on the morning of August 5, 2004, he received calls

from his father and his uncle, both whom knew about the affair.  See Tafoya's Interrogation at 3:51.

50.     Tafoya then talked about the events of the morning, in which he and his wife

"were talking stupid" about killing themselves.  Tafoya told Covington that during the discussion he

retrieved his handgun from the dresser.  Tafoya stated that he removed the magazine and set the

handgun down.  Tafoya said that his wife suddenly picked up the gun and shot herself, although he

did not see the shooting occur because he was putting the clip away.  See Tafoya's Interrogation at

3:54-55; id. at 4:34.

51.     Tafoya told Covington that he owned the Taurus 9 mm. pistol, which he had

purchased from a friend's cousin for $350.00.  See Tafoya's Interrogation at 3:56.

52.     Tafoya admitted to Covington that he had been using heroin and that he had

used cocaine the morning before the shooting.  Tafoya told Covington that he had been "clean for

two years," but that he and his wife had started using cocaine regularly about two weeks before the

shooting and that he had ingested two or three lines of the drug on the morning of August 4, 2004.

Tafoya indicated that he was experiencing nose bleeds because of his cocaine use.  See Tafoya's

Interrogation at 5:20-38.

-9-

53.     Tafoya also admitted to selling marijuana, and said that he hid the marijuana in the laundry room after the shooting because he knew the police would be showing up at his home. See Tafoya's Interrogation at 4:42; id. at 5:38.

54.     Tafoya understood all of Covington's questions, and gave appropriate and clear answers to them.  At no time during the course of the interrogation did Tafoya tell Covington that he did not wish to talk further or that he wanted to speak to an attorney.  See Tafoya's Interrogation at 3:41 - 5:58.

55.     Covington did not coerce Tafoya into making a statement or exploit Tafoya's emotional state during the interrogation.  See Tafoya's Interrogation at 3:41 - 5:58.

56.     Once Sheriff's deputies removed Tafoya's wife's body was from the master bedroom, BCSO investigators recovered a Taurus 9 mm. pistol.  See Search Warrant Return and Inventory at 4.  It was the same pistol that Tafoya admitted he had purchased.  See Transcript at 118:6-7.  Sheriff's Deputies took the pistol into custody.  See id. at 117:16-20.

57.     In a dresser drawer, BCSO investigators located a pistol magazine containing 9 mm. ammunition and approximately $5,500.00 in cash.  They found marijuana and a scale in the laundry room.  See Search Warrant Return and Inventory at 4.

58.     The investigators recovered the marijuana and scale during the execution of the search warrant, and they were in police possession when Tafoya revealed their location to Covington.  See Transcript at 81:6-17.

**5.     Bureau of Alcohol, Tobacco, Firearms and Explosives Investigation Regarding Federal Firearms Violations.**

59.     Covington contacted ATF Special Agent Martin Young about possible federal

-10-

firearms charges against Tafoya.  <u>See</u> Transcript at 115:14-21.

60.     Young arrived at BCSO while Covington was interrogating Tafoya and observed the interrogation.  <u>See</u> Transcript at 116:15-19.

61.     Young advised Covington of the facts necessary for a federal firearms charge and suggested to Covington some questions he might ask Tafoya to elicit that information.  <u>See</u> Transcript at 122:20-24.

62.     Young interviewed Tafoya's wife's family members and friends.  <u>See</u> Transcript at 118:10-13.  Virginia Sigala and her brother, Phil Sigala, said that Tafoya was often "high" at family functions because he used marijuana and crack cocaine. <u>See</u> <u>id.</u> at 121:8-16.  Carol Baker, Tafoya's wife's friend, told Young that Tafoya was a narcotics addict.  <u>See</u> <u>id.</u> at 119:16-19.

63.     Based upon Tafoya's admissions and the Sigala family's statements, Young determined that Tafoya had an ongoing drug problem.  <u>See</u> Transcript at 118:17-19; <u>id.</u> at 119:5-7; <u>id.</u> at 119:16-19.

64.     New Mexico Probation and Parole ("NMPP") Officer Krysten Daniels testified that, after being assessed by Behavioral Intervention, Inc. in April 2003, Tafoya had been admitted to the Second Judicial District Court Drug Court Program in April 2003.  <u>See</u> Transcript at 90:9 - 91:4.  Daniels testified that, for an individual to be admitted into the Drug Court Program, the person must test positive for drug use or admit an addiction.  <u>See</u> <u>id.</u> at 89:21 - 90:2.

65.     Daniels testified that NMPP Officer Lynette McDonough recommended that Tafoya be terminated from the Drug Court Program.  <u>See</u> Transcript at 113:9-13.  Daniels further testified that Tafoya was terminated from the program as an unsuccessful participant in March 2004 for testing positive for cocaine use and for shoplifting. <u>See</u> <u>id.</u> at 93:10 - 94:6.

-11-

## PROCEDURAL BACKGROUND

Tafoya moves the Court to suppress as evidence against him any and all statements that he made to law enforcement at the time of his initial detention on August 5, 2004.   Tafoya seeks to suppress not only statements but also "derivative evidence" obtained in his police interrogation. Tafoya contends that, in obtaining both categories of evidence, the investigating officers violated his Fourth, Fifth, and Sixth Amendment rights.   Tafoya requested that the Court hold an evidentiary hearing and review the applicable evidence and testimony.   The Court reviewed the seven hours of the videotaped detention and interrogation before and after the hearing.

## APPLICABLE LAW

**1.      Law Regarding Detention.**

The Supreme Court of the United States has identified three seizures that may occur without probable cause because they "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less that probable cause, so long as police have an absolute basis for supporting criminal activities." Michigan v. Summers, 452 U.S. 692, 699 (1981).  The three seizures are:  (i) "stop and frisk," i.e., where police stop a person to pat him down and question him if they believe he is armed and dangerous; (ii) a brief stop at or near an international border; and (iii) the detention of a person while his home is being searched pursuant to a search warrant.  Id. at 698-99.

An officer may detain a person without probable cause if the police are searching his home pursuant to a search warrant.  See id. at 705.  Such detention is justified because, when issuing a search warrant, a judge determines that there is probable cause that criminal activity occurred at the home with which the occupant may be connected, and thus detention minimizes the risks to the

officers and prevents flight if officers locate incriminating evidence when executing the search.  See id. at 701.

**2.      Law Regarding Waiver of Miranda Rights**.

The United States has the burden to show that a waiver is made voluntarily, knowingly, and intelligently.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The United States must first establish that the "relinquishment of the right . . . [has] been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  Second, the United States must show that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.  "Any statement given freely and voluntarily without any compelling influences" is admissible.  Miranda v. Arizona, 384 U.S. at 478.

In Michigan v. Mosley, 423 U.S. 96 (1975), the defendant was arrested on suspicion of robbery.  See id. at 97.  A detective advised the defendant of his Miranda rights and began to interrogate him.  See id.  When the defendant stated that he did not want to answer questions about the robberies, the detective ceased the interrogation.  See id.  More than two hours later, after reading him his Miranda warnings a second time, a different detective asked the defendant about a murder.  See id. at 97-98.  The defendant confessed to the murder.  See id. at 98.  The trial court denied his motion to suppress and he was convicted.  See id. at 99.  The Michigan Court of Appeals reversed the conviction, holding that the second interrogation violated the Miranda doctrine.  See id.  The Supreme Court of Michigan denied review.  See id.

The Supreme Court of the United States vacated the judgment and remanded.  See id. at 107.  In an opinion by Justice Stewart, the Court held that "the admissibility of statements obtained after

the person in custody has decided to remain silent depends under <u>Miranda</u> on whether his 'right to cut off questioning' was 'scrupulously honored.'" <u>Id.</u> at 104.  The Court found that the test had been met.  <u>Id.</u>

> Before his initial interrogation, Mosley was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished.  He orally acknowledged that he understood the <u>Miranda</u> warnings and then signed a printed notification-of-rights form.  When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position.  After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder.  He was given full and complete <u>Miranda</u> warnings at the outset of the second interrogation.  He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options.  The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries.  Detective Hill did not resume the interrogation about the White Tower Restaurant robbery or inquire about the Blue Goose Bar robbery, but instead focused exclusively on the Leroy Williams homicide, a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by Detective Cowie.

<u>Id.</u> at 104-05.

**3.    Law Regarding Involuntary Statements.**

A statement is "involuntary" if "a defendant's will was overborne" considering "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation."  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.  We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause."  <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).  "While the defendant's mental condition is an important consideration, to find a statement involuntary, the police must somehow overreach by exploiting a

weakness or condition known to exist." United States v. Guerro, 983 F.2d 1001, 1002 (10th Cir. 1993).

**4.     Law Regarding Good Faith Exception.**

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court created a "good faith" exception to the Fourth Amendment's exclusionary rule. See id. at 913. "[O]ur evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case in chief." Id. The Supreme Court identified four situations where the "good faith exception" would not apply:  (i) where the affiant exhibited deliberate or reckless disregard for the truth, thereby misleading the issuing judge; (ii) where the issuing judge wholly abandoned his neutral and detached judicial role; (iii) where the warrant is based on an affidavit so lacking in indicia of probable cause that it renders official belief in its existence entirely unreasonable; and (iv) where the warrant itself is facially deficient, for example if the warrant does not contain a particularized description of the place to be searched or items to be seized. Id. at 923.

**5.     Law Regarding Inevitable Discovery Rule.**

If a search warrant violates the Fourth Amendment, the exclusionary rule does not apply if the evidence inevitably would have been discovered by lawful means. See Nix v. Williams, 467 U.S. 431, 444 (1984). The United States Court of Appeals for the Tenth Circuit has applied the inevitable discovery doctrine in several cases, including cases where the police would have inevitably discovered the evidence by an inventory search mandated by police department policy. See United States v. Haro-Salcedo, 107 F.3d 769, 773-74 (10th Cir. 1997); United States v. Horn, 970 F.2d 728, 732

(10th Cir. 1992).

**ANALYSIS**

Tafoya was a suspect in his wife's shooting death, and the investigating Sheriff's deputies were legally justified in detaining and questioning Tafoya immediately after they responded to the Tafoya residence.  While in custody, the lead investigator advised Tafoya of his constitutional rights, and Tafoya knowingly and intelligently waived those rights before he made statements to the investigators.  The statements that Tafoya made were knowing and voluntary as well.  Coercive police activity did not induce Tafoya's statements, and his will was not overborne.  The Sheriff's deputies who spoke to Tafoya did not overreach by exploiting his emotional state, despite their knowledge thereof.  Moreover, the deputies found the marijuana, the scale, and the cash in the defendant's home after the officers had obtained a state search warrant for the residence.  They found the contraband in good faith and inevitably.  Accordingly, the Court will deny Tafoya's motion to suppress.

I.     **BCSO DETAINED TAFOYA PURSUANT TO AN ONGOING CRIMINAL INVESTIGATION.**

The events at the Tafoyas' home on August 5, 2004 were unfortunate.  While Tafoya contends that his emotional state at the time is undescribable, the Court must make some effort to describe and then characterize it.

At the beginning of his stay in the interrogation room, Tafoya cried more than he did later in the day.  He controlled his crying as the day progresses.  His crying and pounding on the floor with his feet occurred early in the day.  While Tafoya was despondent, it is not clear whether this state was caused by his wife's death or because of his concern for his situation.  The United States and Tafoya

agree that Tafoya was detained for a lengthy period of time while the Sheriff's Office conducted its preliminary investigation.  The detectives legally and justifiably detained Tafoya, and Tafoya does not argue otherwise.

The investigation presented BCSO with a situation where a judge determined that there was probable cause that there had been criminal activity at Tafoya's home with which Tafoya was connected; detention prevented his flight if the investigators located incriminating evidence when they executed the search.  See Michigan v. Summers, 462 U.S. at 701.  The deputies and detectives responded to Tafoya's 911 call, and the preliminary information from Tafoya was that he and his wife had been experiencing marital problems because of his wife's affair.  The early investigation revealed that Tafoya was the only person present when his wife was fatally shot.  Investigators quickly learned from family and friends about the affair.  Covington and his team were thus investigating a possible homicide, and Tafoya was an immediate suspect in his wife's death.  Tafoya's detention was therefore lawful and justified.

The United States agrees that Tafoya was in custody and that no one in his position would have felt that he was free to leave the Sheriff's office.  See Government's Response to Motion to Suppress at 7.  Covington, however, explained to Tafoya the reasons he could not leave or talk to family members, the reasons they had to interview family and friends, the reasons they took his clothing for testing, and the reasons they swabbed his hands and mouth.  Covington told Tafoya that all of the investigative steps would take a fair amount of time and were necessary so that BCSO could determine what the evidence would demonstrate about Tafoya's wife's death.  Covington made an effort to ensure that Tafoya understood what the investigators were doing, and he told Tafoya that he did not need to say anything to the investigators unless he wished to do so.  Tafoya told Covington

-17-

that he did not wish to say anything at that point, and the detectives respected that request.  They were not, however, thereby automatically precluded from interrogating Tafoya later in the day.

The facts of this case are similar to those of <u>Michigan v. Mosley</u>.  As was true in that case, Tafoya told the interrogating officers that he wished not to make a statement.  <u>See</u> Tafoya's Interrogation at 11:52.  Indeed, here Tafoya said: "Not right now."  Tafoya's Interrogation at 11:52.  The detectives respected that request.  <u>See</u> Tafoya's Interrogation at 11:55-56.  Some four hours later, a longer period than in <u>Michigan v. Mosley</u>, 423 U.S. at 97-98, Covington advised Tafoya of his <u>Miranda</u> rights and began questioning him about a different crime, a federal firearms violation, than that for which he was originally detained, the death of his wife.  <u>See</u> Tafoya's Interrogation at 3:40-42; Transcript at 122:20-24.  Tafoya then made inculpatory statements.  <u>See</u> Tafoya's Interrogation at 3:56; <u>id.</u> at 5:20-38.

Had Tafoya told the deputies that he did not want to talk further or that he wanted to speak to an attorney, they would have had to cease questioning him altogether.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. at 473-74.  Tafoya advised Covington that he did not wish to make a statement "right now," after Covington had stated: "I'm not going to ask you anything" and "You don't have to say anything you don't want to say."  Tafoya's Interrogation at 11:49-52.  The proper inquiry is therefore whether Tafoya's "right to cut off questioning was scrupulously honored."  <u>Michigan v. Mosley</u>, 423 U.S. at 104.  The Court finds that it was.

## II.    COVINGTON ADVISED TAFOYA OF HIS RIGHTS, AND TAFOYA MADE A KNOWING WAIVER OF HIS RIGHTS.

Tafoya made a knowing waiver of his right to remain silent.  Tafoya waived his right of silence because he provided an extensive statement to Covington after the advise of rights.  The case is

analogous to <u>United States v. Ogden</u>, 572 F.2d 501 (5th Cir. 1978), in which Ogden, who was under

arrest for marijuana smuggling, indicated that he understood his rights after the police officers gave

him the standard <u>Miranda</u> warnings and then nevertheless made inculpatory statements.  <u>See</u> <u>id.</u> at

502.

       Tafoya asserts that he invoked his right to silence earlier in the day.  The videotape of the

interview and the evidence at the hearing show, however, that Tafoya initially told Covington he did

not want to make a statement at that point, but did not say that he refused to speak to the detectives

at all.  Later in the day, after the advise of rights, Tafoya implicitly waived his right of silence when

he began answering Covington's questions related to the investigation.

       Covington was careful in his advice of rights to ensure Tafoya understood his rights and that,

if Tafoya gave statements, the government could use them against him in court.  Tafoya told

Covington that he understood his rights.  Tafoya was emotional during the period of time, as many

would be when they are being questioned about the recent violent death of a loved one.  Despite his

emotional state, Tafoya understood all of the questions, because he gave clear and appropriate

answers to them.  Some of his answers were inculpatory.  Tafoya did not tell Covington that he did

not wish to talk further or that he wanted to speak to an attorney, which would have required the

detective to cease the interrogation.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. at 473-74.

       The evidence shows that Tafoya made voluntary and inculpatory statements germane to the

federal charges after Covington advised him of his rights.  Tafoya admitted that he owned a handgun

that he had purchased for protection.  He attempted to unload the gun on August 5 during the

argument with his wife.  He also admitted that he and his wife had used cocaine the day before this

tragedy, and that he sold marijuana.  He also represented to Covington that he had not been using

narcotic drugs for two years before the unfortunate event.  Family members and friends told BCSO detectives that Tafoya had an ongoing drug problem that was well known.  Tafoya's drug problem was serious enough for him to be referred to the Second Judicial District Court Drug Program. Young followed up and determined that Tafoya was admitted to the Drug Court Program in April 2003 because of a pending state shoplifting charge.  Daniels told Young that Program participants must admit to a current drug addiction or test positive for narcotics.  McDonough was assigned to supervise Tafoya in the Drug Court Program, and she told Young that, in March 2004, Tafoya was unfavorably terminated from the program for testing positive for cocaine use.

## III.   TAFOYA'S STATEMENTS WERE NOT "INVOLUNTARY" FOR PURPOSES OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

Tafoya asserts that he could not have made a voluntary statement, given his mental condition at the time of his interrogation.  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Detective Covington did not coerce Tafoya into making a statement, and the Sheriff's deputies who spoke to Tafoya did not overreach by exploiting his emotional state, despite their knowledge of it.

Tafoya was understandably upset, but understood Covington's questions and gave appropriate answers to them.  His will was not overborne by the questioning, and he never refused to answer or requested that counsel be present during questioning.  The interrogating detectives did not exhibit coercion or exploitation of Tafoya's fragile emotional condition.  Their interrogation therefore did not violate the Due Process Clause.

## IV.   AS PART OF THE OVERALL CRIMINAL INVESTIGATION, THE POLICE PROPERLY SEIZED THE MARIJUANA, SCALE AND CASH AS CONTRABAND.

Tafoya asserts that the police's seizure of the marijuana and scales was the product of an unlawful interrogation and that the Court must suppress this evidence as fruit of the poisonous tree pursuant to Wong Sun v. United States, 371 U.S. 471 (1963).  Covington advised Tafoya of his rights, which he waived.  In the course of his statements to the detective, Tafoya confessed that he had been using heroin and cocaine and selling marijuana.  He further told Covington that he had hidden marijuana in the laundry room of his home.  Hence, he has no basis to seek suppression of this evidence.

Even if Tafoya had not so confessed, the investigating police officers were legally in the home to execute a search warrant, and they had the authority to seize any contraband that they located in the course of their search.  Were the Court to find that the state search warrant was invalid as to the location and to the seizure of the marijuana and related evidence, the Court would not suppress the evidence because the officers executing that warrant had faith in its validity.  None of the four factors that the Supreme Court has identified as precluding application of the good faith exception are present.  Tafoya told the BCSO investigators that he sold marijuana and where he had hidden the marijuana and scale.  In the course of executing their search warrant, the BCSO investigators found the identified contraband along with approximately $5,500.00 in cash.

The second exception that applies is the inevitable discovery rule.  Tafoya seeks to suppress evidence about which he told the lead BCSO detective, and the investigators were legally at the residence to execute a state search warrant.  The investigators had full access to the home to look for evidence of a possible homicide and would have inevitably discovered the contraband evidence through the search.  Indeed, Covington testified that the investigators had recovered the marijuana before Tafoya confessed its location to Covington.  As a result, based upon the facts and legal

-21-

authorities, the Court will not suppress the evidence.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence is denied.


_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

David C. Iglesias
  United States Attorney for the
  District of New Mexico
Roberto D. Ortega
  Assistant United States Attorney
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

Roger A. Finzel
  Assistant Federal Public Defender
Albuquerque, New Mexico

     _Attorney for the Defendant_